618 S.E.2d 909

**Gene W. CROFT, Jr., as Personal Representative of the Estate of Gene W. Croft, Sr., Plaintiff,**

v.

**OLD REPUBLIC INSURANCE COMPANY, Defendant.**

No. 26032.

Supreme Court of South Carolina.

Heard April 20, 2005.

Decided Aug. 22, 2005.

Richard A. Harpootlian and M. David Scott, both of Columbia, for Plaintiff.

Clayton M. Custer, Brent O.E. Clinkscale, and Heather G. Ruth, all of Womble Carlyle Sandridge & Rice, PLLC, of Greenville, for Defendant.

Justice BURNETT.

We accepted four questions certified by the United States District Court for South Carolina pursuant to Rule 228, SCACR. The questions involve the applicability of underinsured motorist coverage provisions to exempt commercial policies sold to a commercial insured.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are drawn from the district court's certification order, which includes stipulated facts and findings of fact. Gene Croft, Jr. (Plaintiff), as personal representative of the estate of his father, Gene Croft, Sr. (Decedent) initiated a declaratory judgment action in state court against Old Republic Insurance Co. (Old Republic). Old Republic removed the action to federal court on the basis of diversity jurisdiction.

The underlying complaint alleges Decedent was involved in an automobile wreck while driving a semi-truck belonging to his employer, Penske Truck Leasing Co. (Penske). The driver and passenger in the other vehicle were at fault in causing the wreck. Decedent died as a result of injuries sustained in

the wreck. The alleged at-fault driver and passenger had minimum liability coverage of $15,000, which has been tendered to Plaintiff in return for a covenant not to execute.

Plaintiff alleges Old Republic failed to make a required meaningful offer of optional underinsured motorist (UIM) coverage to the named insured, Penske. Plaintiff seeks to have the automobile insurance policy sold by Old Republic reformed to include UIM coverage up to the liability limit contained in the policy.

The insurance policy in question was a three-year policy, renewable on an annual basis, covering the period of January 1, 2000, to January 1, 2003. The wreck occurred January 23, 2002, within the policy's effective dates. The policy contains a deductible equal to the coverage limits contained in the policy. This type of policy is referred to in the insurance industry as a "fronting policy."

The total combined premium paid by Penske for the policy exceeded $50,000 a year. The policy provided coverage in all fifty states. Before commencing this action, Old Republic did not seek or obtain approval from the South Carolina Department of Insurance (Department) to sell the policy as an "exempt commercial policy" as that term is defined in S.C.Code Ann. § 38-1-20(40) (2002).

From 1998 to 2001, Old Republic presented certain forms purporting to make a meaningful offer of optional UIM coverage to Penske. Penske annually rejected UIM coverage, stating, *e.g.*, in a letter to Old Republic that "our company philosophy is to purchase the **minimum** limits for uninsured/underinsured motorist coverage only where required by statute and reject this extra coverage when permitted by a state" (emphasis in original).

## QUESTIONS

1. Is the Old Republic/Penske policy at issue an "exempt commercial policy" as that term is defined in S.C.Code Ann. § 38-1-20(40)?

2. Assuming the answer to #1 is "yes," are automobile insurers in South Carolina required to make a meaningful offer of optional UIM coverage when selling an "exempt

commercial policy" as that term is defined in Section 38–1–20(40)?

3. Are automobile insurers in South Carolina required to make a meaningful offer of optional UIM coverage when selling a "fronting policy" in which the insured's deductible limits equal the liability limits?

4. In a commercial "fronting policy," is an insurer required to comply with the requirements of *State Farm Mut. Auto. Ins. Co. v. Wannamaker*, 291 S.C. 518, 354 S.E.2d 555 (1987), in order to make a meaningful offer of optional UIM coverage, when the insured has expressed a desire not to purchase UIM coverage?

## STANDARD OF REVIEW

■ In answering a certified question raising a novel question of law, the Court is free to decide the question based on its assessment of which answer and reasoning would best comport with the law and public policies of this state and the Court's sense of law, justice, and right. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 411, 526 S.E.2d 716, 719 (2000) (citing S.C. Const. art. V, §§ 5 and 9, S.C.Code Ann. §§ 14–3–320 and –330 (1976 & Supp.2004), and S.C.Code Ann § 14–8–200 (Supp.2004)); *Osprey, Inc. v. Cabana Ltd. Partnership*, 340 S.C. 367, 372, 532 S.E.2d 269, 272 (2000) (same); *Clark v. Cantrell*, 339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000) (same); *Antley v. New York Life Ins. Co.*, 139 S.C. 23, 30, 137 S.E. 199, 201 (1927) ("In [a] state of conflict between the decisions, it is up to the court to 'choose ye this day whom ye will serve'; and, in the duty of this decision, the court has the right to determine which doctrine best appeals to its sense of law, justice, and right.").

## LAW AND ANALYSIS

### 1. EXEMPT COMMERCIAL POLICY

■ Plaintiff argues the policy at issue is not an "exempt commercial policy" as that term is defined in S.C.Code Ann. § 38–1–20(40) because Old Republic never sought or obtained Department's approval before selling such a policy. Old Republic contends the policy is an exempt commercial policy

under the definition in effect at the time of Decedent's death in January 2002.

The Legislature, defining the term for the first time, provided in 2000 that

> "[e]xempt commercial policies" means policies for large commercial insureds where the total combined premiums to be paid for these policies for one insured is greater than $50,000 annually and as may be further provided for in regulation or in bulletins issued by the director. Exempt commercial policies include all property and casualty coverages except for commercial property and insurance related to credit transactions written through financial institutions.

Act No. 235 § 1, 2000 S.C. Acts 1680 (effective March 7, 2000, and codified at S.C.Code Ann. § 38–1–20(40) (2002)). This provision was in effect at the time of the fatal wreck.[1]

Act No. 235 further provided

> [i]t is unlawful for an insurer doing business in this State to issue or sell in this state any exempt commercial policy, contract or certificate until it has been filed with and approved by the director or his designee. A filing that is filed with the department is deemed to have met the requirements of this chapter unless it (1) does not meet the requirements of law, (2) contains any provisions which are unfair, deceptive, ambiguous, misleading, or unfairly dis-

---

1. The Legislature has amended Section 38–1–20(40) to delete the adjective "large" from commercial insureds and to eliminate the requirement of an annual premium exceeding $50,000. The subsection in its present form provides

 > "Exempt commercial policies" means policies for commercial insureds as may be provided for in regulation issued by the director. Exempt commercial policies include all property and casualty coverages except for insurance related to credit transactions written through financial institutions.

 Act No. 300 § 1, 2002 Acts 3288 (effective January 1, 2003). The Act's title stated the subsection was being amended "to expand the meaning of 'exempt commercial policies.' "

 The Legislature re-enacted Section 38–1–20(40) in identical form in 2003 while revising or adding statutes relating to numerous insurance laws. Act No. 73 § 1, 2003 Acts 847 (effective June 25, 2003). The Act's title stated the subsection was being amended "to change the definition of 'exempt commercial policies' to delete the requirement that the definition include policies for which premiums for one insured is greater than fifty thousand dollars annually."

criminatory, or (3) is going to be solicited by means of advertising, communication, or dissemination of information which is deceptive or misleading. If a filing is not in compliance with this chapter, the director or his designee shall issue an order specifying in detail the provisions with which the insurer has not complied and stating the time within which the insurer has to comply with the order before the filing is no longer valid. An order issued by the director pursuant to this section must be on a prospective basis only and may not affect a contract issued or made before the effective date of the order.

Act No. 235 § 4, 2000 Acts 1681 (codified at S.C.Code Ann. § 38–61–25 (2002)). Under this provision, it is apparent the Legislature intended to allow issuers of exempt commercial policies to file a policy form with Department, and it would be deemed approved unless Department subsequently issued an order to the contrary. *See also* Act No. 235 § 3, 2000 Acts 1680 (providing that insurers which issue exempt commercial policies are not required to obtain approval from Department before selling them) (codified at S.C.Code Ann. § 38–61–20(A) (Supp.2004)).

The Legislature further provided that sellers of exempt commercial policies are not required to file rate schedules and plans with Department. Act No. 235 §§ 6–7, 2000 Acts 1682–83 (codified at S.C.Code Ann. §§ 38–73–340 and –520 (Supp. 2004));[2] *see also* Act No. 235 § 8, 2000 Acts 1683 (providing that statute requiring notice of hearings on rate increases does not apply to exempt commercial policies, which "are not subject to prior approval" by Department) (codified at S.C.Code Ann. § 38–73–910(G) (2002)).

Department has promulgated regulations which for the most part track the language of the previously cited statutes. The regulations provide that "[n]o insurer of exempt commercial policies will be required to file any classification, rate, rule, or rating plan, or modifications thereof, for any exempt commercial insurance line prior to its use in this state." An

---

**2.** The Legislature amended these sections in 2002. In pertinent part, the sections were modified to change the phrases "large commercial policies" and "exempt large commercial policies" to simply "exempt commercial policies." Act No. 300 §§ 2–3, 2002 Acts 3288.

insurer issuing an exempt commercial policy must file the policy form with Department and must maintain a desk file of such forms for examination by Department upon request. Department, after reviewing such a policy form, may disapprove the form for continued use on a prospective basis. S.C.Code Ann. Reg. 69–64 (Supp.2004) (effective June 27, 2003).

Lastly, the Legislature amended a provision contained in Chapter 73 of Title 38, which deals with the filing and approval of certain insurance rates. The Legislature added a subsection in the "Declaration of Purpose" provisions to state that a purpose of the chapter is to "provide for reasonable competition for commercial property and casualty insurers of insureds who make large purchases of insurance." Act No. 235 § 5, 2000 Acts 1681 (codified at S.C.Code Ann. § 38–73–10(a)(4) (2002)); *see also* Act No. 181 § 783, 1993 Acts 2079 (setting forth previous version of § 38–73–10(a)).

Based on the above provisions and focusing primarily on Act No. 235 which took effect in 2000, we answer Question 1 "yes," the policy at issue is an "exempt commercial policy" pursuant to S.C.Code Ann. § 38–1–20(40) (2002). The combined premium for the policy at issue exceeded $50,000 annually and the policy provided casualty coverage.

Old Republic's failure to seek or obtain Department's approval of the policy before selling it does not change the nature of the policy. Old Republic was required to file the policy form with Department, but was not required to obtain Department's approval before selling such policies. Department may impose an administrative fine on Old Republic for failing to follow the filing requirements. *See* S.C.Code Ann. § 38–2–10 (2002).

## 2. REQUIREMENT OF MEANINGFUL OFFER IN SALE OF EXEMPT COMMERCIAL POLICY

█ Plaintiff contends that, even if the policy at issue is an exempt commercial policy, Old Republic is required to make a meaningful offer of UIM coverage because the Legislature has not exempted such policies from this requirement. Old Republic argues the Legislature's "creation of a special category of 'exempt commercial policies' indicates a belief that large

commercial accounts do not need the same close regulation and court supervision as unsophisticated purchasers of insurance do." Thus, it was not required to offer UIM coverage to Penske.

■■■■ The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the Legislature. *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000); *Mid–State Auto Auction of Lexington, Inc. v. Altman*, 324 S.C. 65, 69, 476 S.E.2d 690, 692 (1996). In ascertaining the intent of the Legislature, a court should not focus on any single section or provision but should consider the language of the statute as a whole. *Mid–State*, 324 S.C. at 69, 476 S.E.2d at 692. When a statute's terms are clear and unambiguous on their face, there is no room for statutory construction and a court must apply the statute according to its literal meaning. *Carolina Power & Light Co. v. City of Bennettsville*, 314 S.C. 137, 139, 442 S.E.2d 177, 179 (1994).

S.C.Code Ann. § 38–77–160 (2002) provides "[automobile insurance] carriers shall also offer, at the option of the insured, underinsured motorist coverage up to the limits of the insured liability coverage to provide coverage in the event that damages are sustained in excess of the liability limits carried by an at-fault insured or underinsured motorist or in excess of any damages cap or limitation imposed by statute."

■■■ An automobile insurance carrier in South Carolina is required to make a meaningful offer of UIM coverage when selling an exempt commercial policy to a commercial insured. Old Republic indisputably is an automobile insurance carrier and, as such, was required to make a meaningful offer of UIM coverage to Penske.

No statutory provision exempts insurers which sell exempt commercial policies from the requirement of making a meaningful offer of UIM coverage to a commercial insured as mandated by Section 38–77–160. The only statutes addressing exempt commercial policies are those discussed in Question 1. A review of those statutes reveals the Legislature modified Department's oversight of exempt commercial policies by establishing a system in which approval of such policies is granted upon filing, subject to later review and order by Department. The Legislature also exempted such policies

from the usual rate-making and approval processes. These changes were intended to promote reasonable competition among commercial insurers, as explicitly stated by the Legislature. *See* Section 38–73–10(a)(4).

However, the Legislature did not similarly exempt insurers which sell such policies from complying with the usual requirements of offering UIM coverage to their commercial insureds. Old Republic's argument is based on sheer speculation about the Legislature's intentions. The Legislature could have created such an exemption in Act No. 235 in 2000 when it defined exempt commercial policies and exempted them from certain other requirements; however, it did not do so.

Moreover, the Legislature's amendment in 2002 and 2003 of three statutes addressing exempt commercial policies supports our conclusion. In redefining "exempt commercial policies" in Section 38–1–20(40), the Legislature in 2002 and 2003 changed the phrase "large commercial insureds" to "commercial insureds." The Legislature also deleted from the definition the phrase "where the total combined premiums to be paid for these policies for one insured is greater than fifty thousand dollars annually." *See* footnote 1.

Similarly, the Legislature in 2002 amended Sections 38–73–340 and 38–73–520 to change the phrases "large commercial policies" and "exempt large commercial policies" to simply "exempt commercial policies." *See* footnote 2.

These amendments mean insurers may sell exempt commercial policies to commercial insureds of all sizes, from multinational corporations to "mom-and-pop" operations. Therefore, such a policy may be presented not only to potentially knowledgeable risk managers for large corporations, as occurred in the present case, but also to less sophisticated and knowledgeable insureds who own or manage small businesses. The Legislature apparently recognized that fact and chose not to create an exemption for exempt commercial policies from the requirements of Section 38–77–160. Accordingly, we answer Question 2 "yes," automobile insurance carriers in South Carolina are required to make a meaningful offer of optional UIM coverage when selling an "exempt commercial policy" as that term is defined in Section 38–1–20(40).

## 3. REQUIREMENT OF MEANINGFUL OFFER IN SALE OF FRONTING POLICY

Plaintiff asserts the Legislature has not exempted an insurer which sells a "fronting policy" from making a meaningful offer of UIM coverage to a commercial insured. Old Republic, relying on foreign authority, argues it should not be required to make a meaningful offer of UIM coverage when selling a fronting policy to a commercial insured which wishes to reject all optional coverages. Old Republic further asserts Section 38–77–160 does not apply to its fronting policy because that policy was not "insurance" which involved a transfer of risk to Old Republic.

"Fronting policies" and related forms of partial self-insurance have become prevalent since the 1980s due to increases in insurance premiums. A fronting policy, of which there are various forms, is one or more steps removed from true self-insurance. It has been defined as a legal risk management device, typically used by large corporations operating in multiple states, in which the corporation pays a discounted premium to an insurer. The insurer maintains licensing and filing capabilities in a particular state or states, and issues an insurance policy covering the corporation in order to comply with the insurance laws and regulations of each state.

The corporation retains at least part of the risks covered under the fronting policy. One such means of retaining the risk, as seen in the present case, is by a deductible which equals the policy's liability limits. The insured usually is left to administer all claims, although the insurer may reserve this authority to itself in some instances.[3] The insured agrees to reimburse the insurer for all payments it must make. *See MacDonald v. Pacific Employers Ins. Co.*, 264 F.Supp.2d 576, 581–83 (N.D.Ohio 2002); *Lafferty v. Reliance Ins. Co.*, 109

---

**3.** Penske apparently does not administer its own claims process, although the limited record before us does not reveal the precise arrangement. Old Republic states in its brief that "Penske negotiates its own premiums, covers its own losses throughout the country, and pays a premium only to cover the vast administrative expenses associated with such an arrangement." At oral argument, counsel for Old Republic stated that claims against Penske are handled by a third-party administrator. The fact that an entity other than Penske administers the claims process lends further support to the conclusion Penske is not self-insured, but purchased an insurance policy.

F.Supp.2d 837, 844–46 (S.D.Ohio 2000); *Aerojet–General Corp. v. Transport Indem. Co.,* 17 Cal.4th 38, 70 Cal.Rptr.2d 118, 948 P.2d 909, 914 n. 3 (1997); Mark W. Flory & Angela Lui Walsh, *Know Thy Self–Insurance (and Thy Primary and Excess Insurance),* 36 Tort & Ins. L.J. 1005, 1006–07 (2001); Rory A. Goode, *Self–Insurance as Insurance in Liability Policy "Other Insurance" Provisions,* 56 Wash. & Lee L.Rev. 1245, 1257 (1999); William T. Barker, *Combining Insurance and Self Insurance: Issues for Handling Claims,* 61 Def. Couns. J. 352, 353 (1994); 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* §§ 10:1 to 10:3 (1997) (discussing self-insurance).

■ Some courts and commentators have stated that insureds who purchase fronting policies are in the practical sense self-insured because such policies involve no transfer of risk from the insured to the insurer. We disagree with the premise there is no transfer of risk in such policies. In a fronting policy, "[t]he insurer functions purely as a surety for the insured's ability to pay claims, and the benefit extends only to third parties in situations in which the policy holder is unable to pay a liability owed to a third party." Goode, *supra* at 1257; *see also* Barker, *supra* at 353 (stating same principle). Thus, Old Republic has assumed the risk—which it presumably has found acceptable based on Penske's net worth and financial capacity—that it will have to pay a claim if Penske becomes insolvent.

We find persuasive the views expressed in *Gilchrist v. Gonsor,* 104 Ohio St.3d 599, 821 N.E.2d 154 (2004). In that case, decided on facts similar to the present case, an employee was injured in an on-the-job vehicle wreck caused by another motorist. The employee sought coverage under his employer's uninsured motorist (UM) policy, which was a fronting policy in which the employer's deductible equaled the policy's liability limit of $1 million.

The Ohio Supreme Court explained that the employer, in purchasing an insurance fronting policy, was not self-insured because it had not obtained a certificate of self-insurance under the statutory process. Instead, the employer had established proof of financial responsibility as statutorily required by purchasing a contract of insurance—the fronting

policy. Under the statute then in effect, a vehicle liability policy could not be issued or delivered in Ohio unless UM coverage was offered to the policyholder. The court held this provision applied to fronting policies. *Id.* at 156–57; *see also Couch on Insurance 3d* § 10:1 (self-insurers in many states are required to comply with procedures to obtain a certificate of self insurance, and the reason for strictly enforcing such requirements is to protect the public).

A concurring justice further explained the court's reasoning. "[The employer] and [the insurer] seek to describe their contract of insurance for one purpose and as something else for another purpose. . . . It is not consistent to argue that the contract is an insurance policy for purposes of complying with Ohio's financial responsibility requirement and that the same policy is not one of insurance in order to avoid the mandatory UM/UIM offering under [Ohio law]." *Gilchrist,* 821 N.E.2d at 156–57 (Moyer, C.J., concurring). Furthermore, "it is clear that [the insurer] exposed itself to at least some risk. The fact [the insurer] carried some risk of loss further verifies that the arrangement in this case was an insurance policy and is therefore subject to the previous decisions of this court that create liability for UM/UIM coverage pursuant to [Ohio law]." *Id.*

■ In South Carolina, " '[i]nsurance' means a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." S.C.Code Ann. § 38–1–20(19) (Supp.2004). A " '[p]olicy' means a contract of insurance." S.C.Code Ann. § 38–1–20(30) (Supp. 2004). " '[A]utomobile insurance' means automobile bodily injury and property damage liability insurance, including [a list of various forms of vehicle-related coverage] . . . as provided by this chapter written or offered by automobile insurers." S.C.Code Ann. § 38–77–30(1) (2002).

In the context of automobile insurance, a person or corporation in South Carolina is required to provide proof of financial responsibility for potential accidents in order to legally operate a motor vehicle. Such financial responsibility may consist of an insurance policy or surety bond with the required or optional coverages. S.C.Code Ann. §§ 56–10–10 to –40 and 56–10–210 to –280 (1991 & Supp.2004) (requiring proof of

insurance or other acceptable security in order to register motor vehicle and establishing fines and criminal penalties for failure to do so); S.C.Code Ann. §§ 38–77–140, –150, and –160 (2002) (establishing requirements of mandatory minimum insurance limits, mandatory uninsured motorist coverage, and requiring automobile insurers to offer additional uninsured and underinsured motorist coverage, respectively).

A person, if eligible under statutory requirements, may register an uninsured motor vehicle by paying a $550 fee to the state Department of Motor Vehicles (DMV). S.C.Code Ann. §§ 56–10–510 to –540 (Supp.2004). A company or person who has more than twenty-five motor vehicles registered in his name may qualify as a self-insurer by meeting the statutory requirements and obtaining a certificate of self-insurance from the DMV. S.C.Code Ann. §§ 56–9–60 and 56–10–510 (Supp.2004).

Penske complied with the financial responsibility requirements by purchasing an insurance policy, not by seeking approval of a surety bond or obtaining a certificate of self-insurance from DMV as allowed by statute. Old Republic sold Penske a policy of automobile insurance as those terms are statutorily defined, *i.e.*, it sold Penske a contract of insurance which provided automobile bodily injury and property damage liability insurance. The fact Penske is required under the policy to subsequently reimburse Old Republic for claims paid up to the policy limits does not change the fact that Old Republic agreed to indemnify Penske, particularly since Old Republic has assumed the risk of Penske's insolvency, however slight.[4]

---

4. Events in recent years repeatedly have demonstrated the fallacy of the belief that a large corporation with billions of dollars in revenue or assets is an invincible operation with little risk of collapse. To understand this, one has to look no further than the accounting scandals and bankruptcies at companies such as Worldcom, Inc. ($103.9 billion in assets upon filing bankruptcy in 2002); Enron Corp. ($63.4 billion in assets upon filing in 2001); Conseco, Inc., ($61.4 billion in assets upon filing in 2002); Texaco, Inc. ($35.9 billion in assets upon filing in 1987); or Adelphia Communications ($21.5 billion in assets upon filing in 2002). *See* "The Largest Bankruptcies—1980 to Present," compiled by New Generation Research, Inc. (available at http://www.bankruptcyda-ta.com/Research /15_tlLargest.htm).

Moreover, the fact Penske purchased a so-called "fronting policy" does not transform Penske into a self-insured entity entitled to avoid the requirements of South Carolina law. The Legislature has not defined such policies as a form of self-insurance; nor has the Legislature established an exception for fronting policies from UIM-related requirements. Therefore, the laws of this state apply with equal force to such policies. Neither Old Republic nor Penske, while acting legitimately in their corporate self-interest to spend less money on insurance, are allowed to avoid statutory insurance requirements and unilaterally bestow upon Penske the classification of a self-insured entity. Accordingly, we answer Question 3 "yes," automobile insurance carriers in South Carolina are required to make a meaningful offer of optional UIM coverage when selling a "fronting policy" in which the insured's deductible limits equal the liability limits.

### 4. APPLICABILITY OF WANNAMAKER ANALYSIS IN SALE OF FRONTING POLICY

Plaintiff argues the determination of whether an insurer has made a meaningful offer of UIM coverage is an objective inquiry based on the language and form of the offer. It is neither necessary nor proper to consider the insured's subjective state of mind or wishes.

Old Republic asserts that, because Penske is a "knowledgeable, sophisticated insured" which repeatedly rejected UIM coverage, it should not have to comply with the requirements of *State Farm Mutual Auto. Insurance Co. v. Wannamaker*, 291 S.C. 518, 354 S.E.2d 555 (1987), and its progeny. Old Republic also asks we find a meaningful offer was made in this case.

We recently set forth the basic principles of law regarding meaningful offers in *Progressive Cas. Ins. Co. v. Leachman*, 362 S.C. 344, 608 S.E.2d 569 (2005):

The insurer bears the burden of establishing it made a meaningful offer. *Butler v. Unisun Ins. Co.*, 323 S.C. 402, 405, 475 S.E.2d 758, 759 (1996). A noncomplying offer has the legal effect of no offer at all. *Hanover Ins. Co. v. Horace Mann Ins. Co.*, 301 S.C. 55, 57, 389 S.E.2d 657, 659 (1990). "If the insurer fails to comply with its statutory

duty to make a meaningful offer to the insured, the policy will be reformed, by operation of law, to include UIM coverage up to the limits of liability insurance carried by the insured." *Butler*, 323 S.C. at 405, 475 S.E.2d at 760. In general, for an insurer to make a meaningful offer of UIM coverage, (1) the insurers notification process must be commercially reasonable, whether oral or in writing; (2) the insurer must specify the limits of optional coverage and not merely offer additional coverage in general terms; (3) the insurer must intelligibly advise the insured of the nature of the optional coverage; and (4) the insured must be told that optional coverages are available for an additional premium. *State Farm Mut. Auto. Ins. Co. v. Wannamaker*, 291 S.C. 518, 521, 354 S.E.2d 555, 556 (1987).

In response to *Wannamaker*, the legislature enacted a statute establishing the requirements for forms used in making offers of optional insurance coverage such as UIM. The statute directs the insurer to include the following in its offer:

(1) a brief, concise explanation of the coverage;

(2) a list of available limits and the range of premiums for the limits;

(3) space for the insured to mark whether the insured chooses to accept or reject the coverage, and a space to select the limits of coverage desired;

(4) a space for the insured to sign the form, acknowledging that the optional coverage has been offered; and

(5) the mailing address and telephone number of the Department, so that the insured may contact it with any questions that the insurance agent is unable to answer. S.C.Code Ann. 38–77–350(A) (2002).

An insurer enjoys a presumption it made a meaningful offer if it executes a form that complies with this statute. S.C.Code Ann. 38–77–350(B) (2002); *Antley v. Nobel Ins. Co.*, 350 S.C. 621, 632, 567 S.E.2d 872, 878 (Ct.App.2002). If the form does not comply with the statute, the insurer may not benefit from the protections of the statute. *Osborne v. Allstate Ins. Co.*, 319 S.C. 479, 486, 462 S.E.2d 291, 295 (Ct.App.1995). Furthermore, a form does not necessarily constitute a meaningful offer simply because it was ap-

proved by the Department of Insurance. *Butler,* 323 S.C. at 408–409, 475 S.E.2d at 761.

*Progressive Cas. Ins. Co.,* 362 S.C. at 348–50, 608 S.E.2d at 571–72.

 We answer Question 4 "yes," an automobile insurer selling a fronting policy to a commercial insured is required to comply with *Wannamaker* and its progeny in order to make a meaningful offer of UIM coverage even though the insured has expressed a desire not to purchase such coverage. Automobile insurers offering commercial policies, including fronting policies, are not exempt from the meaningful offer requirement contained in Section 38–77–160 because the Legislature has recognized that commercial insureds, like non-commercial insureds, undoubtedly run the gamut from the ill-informed to knowledgeable purchasers.

Whether a meaningful offer was made depends on the facts and circumstances of a particular case, and the inquiry in this instance must be resolved in the federal proceeding. The impact of the insureds knowledge or level of sophistication regarding insurance matters on the determination of whether a meaningful offer was made cannot be decided on the limited record and arguments presented to us. Instead, such a decision is more appropriately resolved by a factfinder which has an opportunity to consider the entire factual record and the parties arguments.

 Evidence of an insureds knowledge or level of sophistication is not relevant when the analysis is confined to whether a particular written form complies with the statutory requirements, such that the insurer enjoys a presumption that it made a meaningful offer. That analysis simply involves a review of the written form itself.

 However, evidence of the insureds knowledge or level of sophistication is relevant and admissible when analyzing, under *Wannamaker,* whether an insurer intelligibly advised the insured of the nature of the optional UM or UIM coverage. It is a subjective inquiry to the extent the insured may offer evidence of his understanding, or lack thereof, of the nature of UM or UIM coverage. It also is an objective inquiry because the factfinder should consider the insureds

knowledge and level of sophistication in determining whether the insurer intelligibly explained such coverage to the insured. *See McDowell v. Travelers Prop. & Cas. Co.*, 357 S.C. 118, 123–25, 590 S.E.2d 514, 516–17 (Ct.App.2003) (affirming grant of summary judgment to insurer on issue of whether a meaningful offer was made under *Wannamaker* when evidence revealed commercial insured's professional risk manager was experienced in dealing with vehicle insurance coverage, was fully aware of nature and purpose of UIM coverage, and knew and was able to apply the mathematical formula for calculating UIM premiums under the policy); *Anders v. S.C. Farm Bureau Mut. Ins. Co.*, 307 S.C. 371, 375–76, 415 S.E.2d 406, 408–09 (Ct.App.1992) (sophistication of insured ordinarily is an issue of fact which may be considered by jury in determining whether meaningful offer was made, and "[o]ne who is ignorant and unwary might require more explanation than a sophisticated applicant"). Whether the analysis is focused primarily on the written form, the *Wannamaker* analysis, or both, the purpose of requiring automobile insurers to make a meaningful offer of additional UM or UIM coverage "is for insureds to know their options and to make an informed decision as to which amount of coverage will best suit their needs." *Progressive Cas. Ins. Co.*, 362 S.C. at 352, 608 S.E.2d at 573.

## CONCLUSION

We answer "yes" to each certified question. First, the policy at issue is an exempt commercial policy. Second, an insurer selling an automobile insurance policy must make a meaningful offer of UIM coverage to a commercial insured because the Legislature has not established an exception for exempt commercial policies. Third, an insurer selling an automobile insurance policy, issued in the form of a fronting policy, must make a meaningful offer of UIM coverage because it is an insurance policy and the Legislature has not established an exception for such a policy. Fourth, an insurer selling an automobile insurance policy, issued in the form of a fronting policy, to a commercial insured is required to comply with *Wannamaker* and its progeny in order to make a meaningful offer of UIM coverage even though the insured has expressed a desire not to purchase such coverage. Whether a

meaningful offer was made in the present case is a fact-intensive inquiry which must be resolved in the federal proceeding.

**CERTIFIED QUESTIONS ANSWERED.**

MOORE, WALLER and PLEICONES, JJ., concur.
TOAL, C.J., concurring in a separate opinion.

Chief Justice TOAL.

I concur in all respects with the comprehensive and well reasoned analysis of the majority with one exception. I would go further in answering Question 4 and also find that the offer of optional insurance by Old Republic constituted a meaningful offer.

For an insurer to make a meaningful offer of additional coverage, (1) the insurer's notification process must be commercially reasonable; (2) the insurer must specify the limits of optional coverage and not merely offer additional coverage in general terms; (3) the insurer must intelligibly advise the insured of the nature of the optional coverage; and (4) the insured must be told that optional coverages are available for an additional premium. *State Farm Mut. Auto. Ins. Co. v. Wannamaker*, 291 S.C. 518, 521, 354 S.E.2d 555, 556 (1987).

In the present case, in my opinion, the above requirements for making a meaningful offer were satisfied. Therefore, in my view, Old Republic made a meaningful offer.